**B. D. TAYLOR**

v.

**UNITED STATES of America.**

**Crim. No. 1427.**

United States District Court
W. D. North Carolina,
Charlotte Division.

Jan. 11, 1963.

Bailey Patrick, Jr., Charlotte, N. C., for Taylor.

William Medford, U. S. Atty., J. O. Israel, Jr., Robert J. Robinson, Asst. U. S. Attys., Asheville, N. C., for the United States.

WARLICK, District Judge.

When the above was before the Court of Appeals, 4 Cir., 303 F.2d 165 and on a hearing was reversed and remanded as decided May 2, 1962, Judge Soper, writing the opinion for the Court said, "Our conclusion in the pending case is that the order of the District Judge dismissing the motion should be reversed and the case remanded for further hearing at which the defendant should be permitted to be present. * * *[W]e are of the opinion that the court should have a hearing at which all of the persons, including the prisoner and his attorney, who took part in the arraignment and sentencing, should be given an opportunity to testify in person, and that upon the testimony thus given in open court the Judge shall find whether the provisions of Rule 32 (a) and Rule 11 were complied with."

Further directions were contained in the opinion which would be applicable to the ultimate disposition of the hearing ordered.

On this mandate coming down the undersigned Judge was able, after much correspondence, to secure Mr. Bailey T. Patrick, Jr., an attorney of Charlotte to represent the petitioner, and the hearing was set for Charlotte since it appeared that such would be more convenient to all parties whose presence was being required; which hearing convened at 11:00 o'clock on September 11, 1962.

The following witnesses were present: The petitioner and his wife, Mrs. B. D. Taylor; James M. Baley, Jr., United States Attorney at the time this action was originally heard; James E. Walker, petitioner's attorney at the original hearing; Richard M. Patch, Agent in Charge in North Carolina, with the Federal Bureau of Narcotics of the Treasury Department; Capt. W. A. McCall, Chief of Detectives, and Lt. Charles E. Adams, of the Charlotte Police Department, who were assigned to the Narcotics Squad. The transcript of the evidence contained 191 pages.

From this hearing, as well as the original trial in Charlotte, and the hearing had in Asheville on July 24, 1961, the following facts are found:

That four or five days prior to July 1, 1960, a relatively large raid was made in Charlotte and Mecklenburg County on those known to be dealing in narcotics, and from such raid quite a number of individuals were arrested and placed in jail, and a great deal of publicity was given by the various news mediums. One of those caught in this raid by the police officers was Fred Connor Allen, a known addict, who lived at 224 McDonald Avenue, and who on July 1, gave to Capt. McCall and his associates information to the effect that on that date two men from South Carolina, unknown to him at the time, had approached him at the Baker Cab Company place in Charlotte, inquiring in substance if he was one among the individuals who had recently been arrested in Charlotte for trafficking in narcotics. Allen informed Capt. McCall and his associates that he admitted his identity and one of the men asked him if he was interested in buying additional narcotics. That Allen was informed that they had five hundred morphine tablets which they wished to dispose of. Allen informed them that he was interested in making purchases for his own use and that of future sales, but informed them that he did not at that time have any money,—telling them that if they would come back on July 5, that he would have sufficient money, he hoped, to make such

purchase;—the agreement being that they would telephone Allen on their arrival in Charlotte on that date. Allen immediately, in furtherance of his agreement with the Narcotics Division of the Charlotte Police force telephoned Capt. McCall, giving to him the information obtained. Subsequently Capt. McCall communicated with Federal Narcotics Agent Richard M. Patch in Greensboro, and it was agreed that he would come to Charlotte on July 5.

On getting to Charlotte on such date Mr. Patch met with Capt. McCall and Lt. Adams and interviewed Fred Allen, at which time it appeared that Allen had never seen these two men before but that he was told they had learned his name and the names of others involved in the raid, who were then incarcerated in jail from accounts appearing in the newspapers.

At such time it was agreed that Agent Patch was to pose as a taxi driver, living with the defendant Allen, and in furtherance of an effort to make an apprehension and destroy the narcotics, the three officers together with Allen went to the residence of Fred Allen, all in view of the information which Allen had obtained from the two men,—that the call would be made by them to him between 12:00 and 12:30 on July 5. The three officers together with Allen arrived at Allen's home at approximately 11:45 and at exactly 12:35 one of the men telephoned Allen. The call was monitored, with Mr. Patch listening, and inquiry was made as to whether or not Allen had the money. On Allen replying that he did, instructions were given as to how Allen could meet with the person with whom he was talking on the telephone. Allen had previously been instructed to tell the two men to come to his residence; this he did, —telling them that his car was broken down and that they would have to come out to his house.

At 12:50 a 1955 Cadillac was parked in front of Allen's residence. At that time Lt. Adams was across the street from Allen's house, sitting in an unmarked police car. After the occupants of the Cadillac looked the premises over they got out of the automobile and entered the Allen residence. Those two men were Jerry Ellison Ballew and B. D. Taylor. Each came in and was met by Allen in the living room. Mr. Patch then walked into the living room and was introduced by Allen to Ballew and Taylor as "Jack" and Allen thereupon explained that he and Jack were working together. A general conversation then ensued and Narcotics Agent Patch then asked how much morphine they had for sale; whereupon Taylor, the petitioner, answered that they had 495 tablets. At this time Capt. McCall was in the bedroom adjacent to the living room in which the conversation was had. Inquiry was made by Agent Patch as to the price and Taylor replied, "I can't sell them for less than $2.00 a tablet". Inquiry was then made by Patch as to how much they could supply each week and Ballew in turn replied that they could furnish approximately five hundred tablets, a week, but that he was not too sure. It was then that Mr. Patch asked to see what they had and Taylor told Ballew to go out to the car and get them. Ballew left the Allen home, went to the Cadillac parked in front thereof, and on reaching in it, returned shortly and handed Taylor a bottle which turned out to contain 493 one quarter grain morphine tablets. Thereupon Taylor handed the said bottle to Mr. Patch.

Following his examination to determine the contents thereof, Mr. Patch removed $100 of money advanced from government sources and which had been previously marked, and inquired, "Who gets the money?". Taylor then replied, "It don't make no difference. We are splitting."

Whereupon Mr. Patch said, "Well, I will give half to you and half to you." meaning half to Ballew and half to Taylor. Thereupon he paid $50 to Ballew and handed another $50 to Taylor, who said, "Put it on the table."

At that time it was noticed by Mr. Patch that Lt. Adams was coming up the front walk, and a pre-arranged signal

was given to Capt. McCall in the adjoining room and both almost immediately rushed into the living room.

It is estimated that this interview took approximately twenty minutes, the arrest taking place at 1:15.

Capt. McCall and Agent Patch took Taylor to the Police Department. Agent Patch drove the automobile with Capt. McCall sitting in the back seat with Taylor. Lt. Adams took Ballew in custody and conveyed him to the Police Department. There they were questioned and at 3:45, according to the records, they were taken before a United States Commissioner and bond was set at $10,-000. Each was then delivered to the United States Marshal who transferred them immediately to the Cleveland County Jail at Shelby.

Mr. Patch never saw Taylor from that hour on July 5 until petitioner came into the court on Tuesday, October 4, when the case was called and the plea entered.

Each was charged with a violation of 26 U.S.C. § 470(a), as is shown by the Bill returned by the Grand Jury.

The petitioner was released under bond on July 11, 1960. His co-defendant, Ballew was never able to give bond and remained in custody until his trial on October 4.

Following the apprehension, investigation and preliminary hearing on July 5, as the Treasury Rules require, Mr. Patch made a four page single spaced report of the facts involved in this case and later added certain recommendations, and when received, attached the chemical analysis of the contents of the bottle. However he had previously made a memorandum record of the events and transcribed all of these into his case report. His evidence has consistently been of the same import in the three hearings and is taken from the notes made immediately following the occurrence.

The petitioner and his co-defendant Ballew both lived in Clinton, South Carolina, a relatively small town of less than 8,000 people, situate approximately 95 miles from Charlotte, and both had been raised together in said city, knowing each other virtually since birth.

Each of the two has a rather lengthy criminal record, and both have served a number of prison sentences, and are obviously familiar with courts and court procedure.

Following his release under bail and in either late July or early August, petitioner sought the services of Honorable Frank B. Snepp, a member of a rather large law firm in Charlotte, who not desiring to appear in a criminal case, referred petitioner to James E. Walker, Esquire, a prominent member of the Mecklenburg County Bar and former Solicitor of the 14th Judicial District. Petitioner sought out the services of Mr. Walker and advising him fully as to the facts in the case, and paid him a $100 retainer on an agreed fee of $600 and discussed at length with Mr. Walker a plea of guilty.

The petitioner was very desirous at his first meeting with his attorney that a continuance be had to the next term in April 1961, following the October 1960 term to which he was bound, and acting on his desire, Mr. Walker talked at length with Capt. McCall and Mr. Patch, and later with Mr. McDonald, the Assistant United States Attorney at Charlotte, and on August 25, wrote letters to Mr. O. W. Johnson and Mr. Patch, both of whom are connected with the Treasury Department, requesting a continuance on the grounds that the petitioner's wife was pregnant; and in said letters stated: "Mr. Taylor advised me that he intends to plead guilty."

Mr. Walker was advised by these parties to contact Mr. McDonald, the Assistant District Attorney at Charlotte. Immediately following its receipt and on August 31, Mr. Walker and Mr. McDonald discussed the matter on the telephone, but Mr. McDonald again failed to agree to a continuance, but suggested that Mr. Walker take the matter up with the Court. Incidentally these findings of fact are made from the testimony of Mr. Walker and predicated upon office notes

made by him at various times during his handling of this matter for the petitioner.

On September 2, Mr. Walker again talked with Capt. McCall and Mr. Patch, at which time he was advised that Taylor had been arrested again in South Carolina for selling narcotics to an FBI agent, and was at liberty under a $5,000 bail, for a hearing set in the Western District of South Carolina, and that a continuance would be contested. His testimony further discloses that on September 6, Walker again talked with petitioner on the telephone, discussed the matter of the fee, and that such agreement then made was predicated on a plea of guilty being entered at the trial.

Again on September 23, 1960, petitioner and his attorney had a telephone conversation, all relating again to the matter of a continuance, of the case. Walker's notes further disclose that on Monday October 3, 1960, the date the District Court convened in Charlotte, petitioner's wife called him by long distance and advised him that her husband had entered the Clinton Hospital seeking an operation for the removal of his appendix, and that immediately he called Mr. McDonald, giving him the information about Taylor's hospitalization and seeking a continuance of the case. On the same day Mr. Walker talked with Dr. Blalock, petitioner's surgeon in the Clinton Hospital, so that he might be more secure about his facts, and immediately thereafter came to the District Court seeking to effect such continuance.

Following this information Mr. Patch and the District Attorney, knowing that Ballew had been in custody since his arrest and would have to have his case disposed of, since he was unable to make bail, sought to learn by telephone the exact condition of petitioner.

It was then learned that though Taylor claimed the need for an operation, and that a date had been set during that week for such operation, that Dr. Blalock indicated a delay would not endanger his life and that he could come to Charlotte and stand trial. A continuance was thereupon denied. Mr. Walker was still determined to seek a continuance and after spending the whole of Monday in court, to which petitioner had not yet come for attendance, sought an audience with the Judge, and following such hearing, a continuance was denied, and the hearing set for the following day, Tuesday, October, 4, as scheduled.

Petitioner came to court the next day and the trial took place. Ironically enough the operation for appendicitis has never yet been had and evidently the desire therefor was nothing other than an effort on the part of petitioner to secure a continuance for at least an additional six months period.

When the case was called for trial it was made to appear that petitioner's co-defendant, Jerry Ellison Ballew, was without counsel, and on it appearing to the court that Ballew desired counsel, Mr. Walker was asked in substance whether or not Ballew's interest would conflict with the interest of his client, B. D. Taylor. On responding that in his opinion it would not, he was asked by the court to represent Mr. Ballew, and agreed to and did accept such designation by the court as attorney for petitioner's co-defendant, Ballew. Mr. Walker requested time for a conference and then repaired to an available room of the District Court at Charlotte with Ballew and Taylor, and conferred at length with them. On returning to the court room, he announced his readiness and entered a plea of guilty for both petitioner and Ballew. Both were present at the time and each stood by his side.

Following the taking of testimony, the argument of counsel, and after each defendant was given the opportunity to say anything in his own behalf as Rule 32(a) provides, sentence was pronounced that each be imprisoned for 7½ years.

During Mr. Walker's testimony, which embraces 16 pages, he was asked, among other things, the following question: Q. "Mr. Walker, throughout the time you were representing Mr. Taylor, was the fee and appearance at all times based on the entering of a plea of guilty?"

A. "That is what my notes reflect. These notes were written and I have

shown them to Mr. Patrick. These notes were written at the time, on the 6th of September, 1960."

The Court asked Mr. Walker this question: "Did he ever at any time, Mr. Walker, contend to you that he was not guilty?"

The Witness: "Yes. I don't know how to say this without actually telling you some of the things he told me. He told me a set of facts and from these facts he deduced that he would not be guilty. Now, on these same set of facts which he told me, I told him in my opinion he would be guilty, and that the court would find, or that the jury would find him guilty."

Mr. Walker further testified: "But I made an investigation of my own. I talked to every officer that I knew who had anything to do with it,—who knew anything about it, but the decision was his as to how he would plead. His plea entered by me was his choice after considering all of the facts."

Mr. Walker was asked the following question: "Do you have an opinion satisfactory to yourself as to whether Mr. Taylor understood the nature of the charge which was pending?"

"Yes, Mr. Taylor in my opinion understood the nature of the charge."

Q. "At the time of the trial, here in this court room, did you see or hear any threats, coercion, promises given to Mr. Taylor by anyone?"

His answer being, "No, I didn't hear any threats made to Mr. Taylor or any promises, and I will tell you for sure he didn't get any so far as his counsel was concerned. And further, that when Mr. Taylor came to my office on the morning of Tuesday, October 4, and discussed the matter further with me, and when he left my office that morning he knew he intended to enter a plea of guilty, for that it was decided before we left my office that a plea of guilty would be entered."

Petitioner testifying in his own behalf gave evidence which covered 69 pages. The testimony of his wife was likewise offered as well as that of James M. Baley, Jr., former United States Attorney, and by agreement three affidavits were permitted to be received in evidence as offered by the petitioner, for the same purpose and with the same effect as though each deponent had testified in open court. Accordingly the affidavits of Dr. George R. Blalock, Jerry Ellison Ballew and Edward P. Robinson were admitted and considered.

From a reading of petitioner's testimony one could not but otherwise have an impression that at the time of his original trial he was fully aware of all of its implications and circumstances. A short recitation of certain excerpts therefrom unhesitatingly carries such import. For instance, these questions and answers clearly show that petitioner knew all of the circumstances involved.

"Q. And you mean to say that with the experience you have had in the courts you would allow a man to plead you guilty and not open your mouth to his Honor here, the Judge, and say, 'No sir, that is all wrong?'

"A. Mr. Walker and I had decided for me to plead guilty when we came here. He advised me to plead guilty on the morning of the trial."

"Q. And therefore, sir, you freely and voluntarily allowed your attorney to enter your plea?"

"A. Absolutely did."

"Q. Here in this court?"

"A. Yes sir."

And the following further questions on Cross Examination:

"Q. Now, at the time that you came into this court on the morning that your attorney entered the plea of guilty for you, at that time you knew what you were charged with, didn't you?"

"A. You sir. I knew I was charged with selling narcotics."

"Q. At that time it had been explained to you the penalties of the crime, hadn't it?"

And among other things he stated that he knew that if he was found guilty that he might receive a maximum penal-

ty of 20 years; that he understood fully the charge of the sale of narcotics; and understood when he came into court he intended to plead guilty.

And further, among other things, petitioner stated that he didn't recall that he ever told his attorney, Mr. Walker, at any time, that Mr. Patch had ever threatened or coerced him, but he did have it in mind; and that at all times he was perfectly satisfied with his attorney, and that he had told his attorney that it was his desire to plead guilty.

At the hearing petitioner through his counsel, Mr. Patrick, asked to place an admission into the record to the effect that Point 2 as set out in his petition did not convey the truth and that he desired to strike such from the petition, and incidentally from the instant hearing, such statement and admission being made as follows: This refers to Rule 32(a).

"Mr. Patrick: Your Honor, as a matter of fact, at this time I have discussed this matter with Mr. Taylor and he has said that you did give him a chance to speak after sentence, and we are not making any contentions today that you didn't."

Later on, the following question and answer is set out:

"Q. You say, Mr. Taylor, that His Honor did give you a chance to say anything you wanted to say at sentencing?"

"A. He never denied me the right to say anything that I wanted to, or anybody else that I know of."

Thereupon this contention is not given further consideration and basically takes a big factor from the inquiry being had.

This case originally came before the court under circumstances indicating nothing other than an ordinary controversy at law in which certain parties were charged with the alleged commission of an offense against the government, and was tried and disposed of as any ordinary criminal action and as the law, in the court's opinion, would require.

Subsequently, on April 17, 1961, when the present petition was filed, it was carefully inquired into, a hearing was had and findings were made and filed. On being heard in the Court of Appeals this re-hearing was ordered among other things, as follows:

"If upon such hearing the Judge shall find that the prisoner was induced to plead guilty by reason of threats or coercion on the part of Government's Agents then the sentence should be vacated and the prisoner arraigned a second time and given the right of allocution if he pleads guilty to the charge. If it is found on the other hand that the rights of the prisoner, as set out in this opinion, were not violated the motion to vacate the sentence should be dismissed."

Having again from the order above heard testimony with respect to the original charge and trial, I would be less than honest with myself if I didn't say that I am not impressed by any of the statements made by the petitioner or any evidences offered in his behalf with respect to his contentions, and for the life of me I am unable to understand how he ever hoped in the face of the record and the testimony that now appears in the file, to have been successful in his efforts to escape a just punishment for a serious offense as committed by him and his associate. Being fair with him, let's pause and analyze what the facts are, and what his contentions add up to, and what he would now have one consider.

He would have one believe that a life-long friend of his who lived like he in the same city in South Carolina, and who was without work, and was desirous of going to Charlotte to obtain employment, would pay him $25 to carry him to Charlotte, a distance of 95 miles, when he could easily have made the trip on a bus at a cost not to exceed $4.00. Or that he could as he now claims, have made such trip with his friend, who was transporting 493 morphine sulphate tablets which on the black market had a value of approximately $1,000 and not have become suspicious particularly when his friend stopped and made an unexplained telephone call, and then continued to drive, and after making inquiry after inquiry,

**647**

finally arrived at Allen's home. And that when the bottle containing the morphine was shown, and his arrest being made, that he did not then offer some suggestion as to his connection with the transaction, his presence in Charlotte, his friend's duplicity, and otherwise acquaint Mr. Patch and the two Charlotte officers with the precarious position in which he found himself; or through the charge lodged against him, the hearing before the Commissioner, and all the other acts and deeds which appear in the record as being done and performed in his presence on the date of his arrest and up until the time of his trial, some three months later. His silence through that period is so unexplained and his statement now is such that one would have to be naive beyond explanation to accept such statement at this late date, uncorroborated as it is by worthwhile evidence. Or that he was in good faith when he entered the hospital for an operation after all other efforts at a continuance had failed. And that failing there, came into court, and in open court heard inquiry as to whether or not there would be a conflict of interest in his trial and that of his co-defendant, Ballew; and heard his counsel Mr. Walker, advise the court that there was no such conflict of interest in his opinion, and who was for some time in the anteroom with Ballew and his counsel, and with no one else present, and failed to state to his counsel and contend or otherwise present to the court that he was a victim of Ballew's perfidity, such as he now contends, is to me unbelievable, and that without any corroboration whatsoever, except from those who, like he, would probably take any measure to secure release, did testify against individuals of character to a state of facts which not only are almost inconceivable but which actually could not be true.

To ask the question is to answer it, and in this way: Why would Mr. Patch who had seen the whole unfolding picture while present at the Allen home, for the purpose, along with others, of undertaking to make an arrest and stamp out the traffic in one of the great evils which confronts our country, make threats and undertake to coerce and intimidate one like it is claimed in this particular investigation;—why would such be necessary, when he had before him the two men under such circumstances as the record indicates, and who possessed the abortive narcotics, the marked money, the automobile in which the narcotics had been brought into North Carolina,—and above all, the two men then known as those who had come to Charlotte on July 1 to make the arrangements for the purported sale of narcotics,—make the threats charged against him when he had at his command such positive evidence of guilt? To answer it is to find as a fact that such threats, such offers of coercion, and such alleged intimidations not only were not made but are purely figments of one's imagination, made purposely, long after the trial to deceive, and with the hope that justice might be thwarted.

Based on the foregoing Findings of Fact, I conclude that the petitioner is not entitled to the relief which he seeks for that his plea of guilty was voluntarily made in open court with a complete understanding of the nature of the charge and that he was fully aware of every factor which the law would require that he have prior to the giving in of his plea, and that the arraignment and plea met every requirement of Rule 11, Title 18 United States Code. United States v. Davis, 7th Cir., 212 F.2d 264–267; McCall v. United States, 4 Cir., 256 F.2d 936, 937.

And since the petitioner has withdrawn Article 2 of his original petition wherein he complained of his not being permitted to speak prior to the sentence, as Rule 32(a) requires, and does not now contend therefor, further consideration is not given to it.

Frankly the more one studies this petition and the evidence, the less he is impressed with the petitioner's position. Having such impression, the motion to vacate the sentence is therefore dismissed.